# IN THE COURT OF APPEALS OF IOWA

No. 21-1435
Filed March 30, 2022

IN THE INTEREST OF E.I. and A.W.,
Minor Children,

J.W., Mother,
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Susan Cox, District

Associate Judge.


        A mother appeals the termination of her parental rights.  **AFFIRMED.**


        Michael A. Horn of Horn Law Offices, Des Moines, for appellant mother.

        Thomas J. Miller, Attorney General, and Michelle R. Becker, Assistant

Attorney General, for appellee State.

        Michael Sorci of the Youth Law Center, Des Moines, attorney and guardian

ad litem for minor children.



        Considered by May, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

A mother who has been involved in a methadone treatment program since 2017 for an opiate addiction appeals the termination of her parental rights to her two daughters, born in 2009 and 2011, pursuant to Iowa Code section 232.116(1)(f) (2021). She challenges each step of our three-step termination analysis and argues the juvenile court should have established a guardianship in lieu of termination. We affirm.

## I. Background Facts and Proceedings

This family's history with the Iowa Department of Human Services began in April 2018 after the mother lost control of her vehicle and struck a utility pole. She was taken to the hospital, where she tested positive for opiates, oxycodone, methadone, benzodyazapines, marijuana, and alcohol. The mother was pregnant with her third child at the time. When interviewed by a child protective worker, the mother acknowledged she had abused opiates in the past but said she has been taking methadone since 2017 to curb that addiction. The mother's sister told the worker the mother "was struggling with Xanax abuse."

The department initiated services for the family, which were ongoing when the mother's third child was born in August. Despite those services, the department returned to the family's home in the fall to investigate a report of domestic violence between the parents in the children's presence. The department ended its services for the family in January 2019. Tragically, another investigation was opened at the end of February when the mother's two daughters found their infant brother unresponsive in his swing. The infant passed away, but the cause and manner of his death was undetermined.

The family again came to the attention of the department in July 2019, this time upon a report that the mother was "under the influence of an unknown drug" while caring for the children. The reporter alleged the mother was "slumped over," had "slowed movements, was difficult to wake up, had slurred speech, and was swaying." Only after testing positive would the mother admit to relapsing on oxycodone a week earlier, but she denied any other use. She agreed to temporary removal based on her "unresolved substance abuse issues." The children were placed in the custody of the maternal grandmother under department supervision. In September, the children were adjudicated as in need of assistance under Iowa Code section 232.2(6)(c)(2) and (n) (2019).

The mother had previously submitted to a substance-abuse evaluation in March 2019. By October, however, the mother had not attended any group treatment sessions and only one individual session. The same month, the mother declined drug testing and showed signs of substance abuse on multiple occasions. On one such occasion, during an interview with a department worker about the mother's social history, the mother could hardly stand, had slurred speech, drooled all over herself, and had trouble staying awake. The department reached out to the mother the next day to facilitate a drug test, but she did not respond.

In January 2020, the mother participated in a mental-health assessment and began attending therapy sessions. She also tested negative for drugs over the next few months and underwent another substance-abuse evaluation in March. However, the department was unable to verify the mother's participation in treatment and remained concerned about gaps in her participation in services.

Come July, the department was still unable to verify that the mother was participating in substance-abuse treatment based on her evasiveness with providing releases. The mother was also evasive in providing drug tests requested by the department. In late July, when the mother finally submitted to a hair-stat test, she was positive for cocaine, morphine, heroin, and oxycodone. And although the mother had participated in some mental-health therapy sessions earlier in the year, the department learned she had not attended any since April. It also turned out that the mother's alleged participation in substance-abuse treatment was limited to her reporting to a facility to get methadone and briefly "touching in" with someone there. The department accordingly recommended the initiation of termination proceedings, which the juvenile court ordered the State to commence in its permanency order.

In October, shortly before the termination trial, law enforcement came into contact with the mother while investigating a report that she had burglarized a neighbor's house. When the police arrived at the mother's home, the children were in her care. Law enforcement "described the mother as lethargic, unsteady on her feet, and [displaying] a white, powdery substance on her chin and hands." The mother said the children were there for a "sleepover," although the department had not authorized unsupervised or overnight contact between the mother and children. Several pieces of stolen property were found in the mother's possession. The police also noticed an "off brown" colored substance that looked to be "consistent with cocaine" on a table in the home. The mother refused to allow the police to test the substance on her face or table. She later claimed it was drywall,

which she said that she had a habit of consuming.[1] The grandmother told the police the "white powdery substance" could have been crushed Xanax. Based on the foregoing, the State moved to modify the children's placement from their grandmother to their maternal aunt. The court granted the motion. A sweat patch placed on the mother more than two weeks after this incident was negative for all substances.

Following the termination trial in late October, the juvenile court terminated the father's parental rights. But the court found insufficient evidence to sustain the petition as to the mother, mostly because the department lacked information about the mother's current drug use and treatment due to her lack of cooperation. The court was careful to point out its ruling was not equivalent to granting a six-month extension because there was also insufficient evidence to determine if the children could be returned to her care at the end of that time period. So the court denied the termination petition as to the mother but directed the State to reinitiate separate termination proceedings.[2] Shortly thereafter, and with very little notice to the department, the maternal aunt requested that the children be removed from her care. They were initially placed in the same foster home but, after a short hospitalization, the older child was placed in a separate foster home due to her aggressive behaviors.

---

[1] The mother's testimony about the events that evening differed from the department's account in other material respects, although the department's version was based on body-cam footage it received from law enforcement. The footage was not admitted as evidence in this proceeding.

[2] We note the first termination proceeding was separate from the second. No appeal was taken in the first proceeding and no request was made below that it be included in the district court record, so it is not part of the record on appeal. *See* Iowa R. App. P. 6.801.

The State filed its second termination petition in March 2021. At the trial on that petition, the family-centered services provider testified about her observations of the mother during a visitation that occurred earlier that month. When the provider and the children arrived at the mother's home, the mother and a man were both present and appeared "drowsy." The man grabbed his belongings, including "an orange prescription bottle," and quickly left. The provider then observed the mother to have slurred speech, be tired and "dozing off," and "eating what appeared to be like a drywall substance." The provider ended the visit early, noting the mother was also not doing much to interact with the children.

During her testimony at trial, the mother essentially said that whenever she exhibited signs of substance abuse, it was because she was not taking her methadone regularly. She would admit to only two relapses during the case, once when the proceedings were first initiated in July 2019 and another in December 2020. The mother ended her testimony by requesting that the children be returned to her care or placed under the guardianship of the maternal aunt.

At the end of the two-day trial in March, the guardian ad litem asked the court to delay permanency for ninety days and conditionally place the children with the maternal aunt "to evaluate if this family option would be safe and likely to resolve the need for terminating the mother's parental rights." The court granted the request to delay termination and reopened the record for consideration of placement with the aunt. A third day of trial was held in August. The mother did not appear, apparently due to the existence of an active warrant for her arrest. This warrant resulted from an incident in early June involving the mother "driving a vehicle while under the influence of a combination of unknown drugs" and

"swerving all over the road and r[unning] into a pole." The mother failed field sobriety testing, prescription drugs and illegal narcotics were found in her purse, and she was charged with operating under the influence.

When the trial concluded in August, the children were still in their separate foster placements, both of which were willing to serve as permanency options. The children had previously reported information about visits with the aunt that the department found concerning. And the younger child expressed her preferences to continue living separately from the older child and remain with her foster family. The older child's issues with verbal and physical aggression, which plagued the viability of previous placements, had drastically improved in her current foster home. That child's psychiatrist recommended that she remain in this home and not be placed in the aunt's care, opining the child "has demonstrated more success and positive support in her current foster placement than she has had in multiple placements with her biological family members."

Ultimately, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) (2021), finding the children could not be returned to her care, termination was in the children's best interests, and placing the children under the aunt's guardianship would be contrary to their best interests. The mother appeals, challenging all of these findings.

## II.    Analysis

In our de novo review of termination of parental rights, "[w]e generally apply a three-step analysis." *In re L.B.*, ___ N.W.2d ___, ___, 2022 WL 495312, at *1– 2 (Iowa 2022). We ask whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory

exception applies and should be exercised to preclude termination. *Id.* at *2; *see* Iowa Code § 232.116(1)–(3).

### A.	Ground for Termination

First, the mother challenges the sufficiency of the evidence supporting the final element of Iowa Code section 232.116(1)(f)—that the children could not be returned to her custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4) (requiring clear and convincing evidence that the children cannot be returned to the custody of their parents as provided in section 232.102 at the present time); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). The mother argues the children are old enough to self-protect, and she "had housing, was engaging in substance abuse treatment, and was engaged in therapy."

The children were removed from the mother's care in July 2019 due to her drug abuse. Her abuse clearly continued throughout the proceedings, as evidenced by obvious behavioral indicators. The proceedings began with the mother driving under the influence of drugs and, at the time of the final day of the termination hearing, the mother was the subject of an active arrest warrant for a separate but essentially identical incident. The resulting effects of the mother's drug abuse render her incapable of providing adequate care or supervision for these children. Long story short, the children could not be safely returned to the mother's custody at the time of the termination hearing. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018). As such, we find the evidence sufficient to support termination under section 232.116(1)(f).

**B.     Best Interests**

Next, the mother passively suggests termination is contrary to the children's best interests, citing the "interest in the integrity of the family unit." In determining whether termination is in the best interests of children, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2).

Despite several years of services, the mother has simply not progressed to a point at which her children can be returned to her care. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will . . . be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (quoting *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010)). We conclude the mother has been given ample time to get her affairs in order. These children's best interests are best served by providing permanency and stability now. *See id.* at 778 ("It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." (quoting *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997))). The children are thriving and integrated in their foster placements, both of which are willing to serve as permanency options. *See* Iowa Code § 232.116(2)(b); *cf. In re M.W.*, 876 N.W.2d 212, 224–25 (2016) (concluding termination was in best interests of children where children were well-adjusted to placement, the placement parents were "able to provide for their physical, emotional, and financial needs," and they were prepared

to adopt the children). We agree with the juvenile court that termination is in the children's best interests.

### C.    Statutory Exceptions

Turning to the last step in the analysis, the mother argues "[t]he trial court failed to properly consider Iowa Code [s]ection 232.116(3)(b) and (c)." The exceptions contained in those provisions respectively allow the juvenile court to forego termination when "the child is over ten years of age and objects to the termination" or "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." We first note the application of the statutory exception to termination is "permissive, not mandatory." *M.W.*, 876 N.W.2d at 225 (quoting *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014)).

As to the exception contained in section 232.116(3)(b), the mother argues the older child objected to termination, and the younger child waffled between returning to the mother or remaining in her foster placement. It is certainly true that both children wish their mother was in a position to provide them with stable and consistent care. But, by the last day of the termination trial, both correctly understood that returning to their mother's care was not a viable option. And while the older child did, at times, want the mother's parental rights to remain intact, the mother did not present clear and convincing evidence supporting "a well-defined opinion [of the child] on the issue of termination, much less a clear objection to termination." *See In re A.J.*, 553 N.W.2d 909, 916 (Iowa Ct. App. 1996), *overruled on other grounds by P.L.*, 778 N.W.2d at 39–40; *see also A.S.*, 906 N.W.2d at 476 ("[T]he parent resisting termination bears the burden to establish an exception to

termination . . . ."). Also, the younger child's desire to remain in her foster placement was clear. As for the exception in section 232.116(3)(c), given the long time the children were removed from the mother's care and each child's acknowledgement that returning to her care is not an option, we cannot conclude "termination would be detrimental to the child[ren] . . . due to the closeness of the parent-child relationship[s]." As such, we affirm the juvenile court's decision to not apply these exceptions to overcome termination.

### D.     Guardianship

The mother finally argues that establishing a guardianship with the maternal aunt was a better permanency option than termination, highlighting the maternal aunt's "ability and willingness to be a long term placement for the children" and the children's relationships with extended family. *See* Iowa Code § 232.117(5) (authorizing the court, following a termination hearing, to enter an order in accordance with section 232.104 in lieu of terminating parental rights); *see also id.* § 232.104(2)(d)(1) (allowing for transfer of "guardianship and custody of the child to a suitable person").

We begin with the principle that "a guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)). Although section 232.104(2)(d) allows for the establishment of a guardianship as a permanency option, section 232.104(3) requires "a judicial determination that [such a] planned permanent living arrangement is the best permanency plan for the child[ren]." *See B.T.*, 894 N.W.2d at 32–33. Convincing evidence must also exist to show termination would be contrary to the child's best interests. Iowa Code § 232.104(4)(a). So determining

whether a guardianship is an appropriate avenue for permanency is essentially a best-interests assessment.

A guardianship, rather than termination, would not promote stability or provide permanency to these children's lives. *See In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011) ("So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child to the parent's custody.").  The aunt was already given placement of the children on one occasion, and the placement was abruptly ended after less than a month because she was unable to cope with the older child's behaviors.  A number of professionals, including the older child's psychiatrist, recommended against placing the children with the aunt.  We likewise conclude a guardianship in lieu of termination is not the best permanency plan for the children.

## III.    Conclusion

We affirm the termination of the mother's parental rights.

**AFFIRMED.**